IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA21-34

Filed 7 November 2023

Cleveland County, Nos. 16 CRS 54918-20, 22, 29

STATE OF NORTH CAROLINA

v.

MARIO WILSON, Defendant.

Appeal by Defendant from judgments entered 5 March 2020 by Judge Todd Pomeroy in Cleveland County Superior Court. Heard in the Court of Appeals 5 October 2021.

> *Attorney General Joshua H. Stein, by Assistant Attorney General Zachary K. Dunn, for the State.*
>
> *Marilyn G. Ozer for defendant-appellant.*

MURPHY, Judge.

This appeal arises out of Defendant Mario Wilson's convictions of two counts of first-degree murder, one count of attempted first-degree murder, one count of attempted robbery with a dangerous weapon, and one count of conspiracy to commit robbery with a dangerous weapon. On appeal, Defendant argues (A) the trial court erred in denying his motion to dismiss all charges based on sufficiency of the evidence to support his being the perpetrator and (B) the trial court made inadequate *Batson* findings in light of *State v. Hobbs*. 374 N.C. 345 (2020).

As explained more fully below, viewing the evidence in the light most favorable to the State, the trial court correctly denied Defendant's motion to dismiss the charges. His specific arguments, which concern the alleged physical impossibility of witness testimony, do not actually establish the evidence at issue was impossible. However, because we agree that the trial court's *Batson* findings were procedurally inadequate under *Hobbs*, we reverse and remand for further proceedings consistent with the procedure set forth by our Supreme Court.

## **BACKGROUND[1]**

In early October of 2016, two friends—Stevie Murray and Miranda Woods—reunited via the internet. At some point after reuniting, Woods asked whether she and her partner, a drug dealer named Jerrod Shippy, could come to Murray's house to weigh and package drugs. Murray agreed; and, when Woods and Shippy arrived at Murray's house, they were introduced to Aubre Sucato and Morris Abraham, a couple who frequently spent the night at Murray's house.

At various points throughout the evening of 26 October 2016, Murray, Woods, Shippy, Sucato, and Abraham began spending time at Murray's house, drinking alcohol and taking drugs until the early morning hours of 27 October 2016. Murray's three-year-old son, Liam, and ten-month-old baby were in the house, the former of

---

[1] As the details of the crimes with which Defendant was charged are material only to the arguments concerning his motion to dismiss, we present the evidence of those events in the light most favorable to the State. *State v. Irwin*, 304 N.C. 93, 98 (1981).

whom was watching television in the living room where some of the adults were spending time. Abraham left just as Shippy arrived, and the two exchanged a moment of hostility. Shippy was armed with a handgun.

Later in the evening, the four remaining in the house—Murray, Woods, Shippy, and Sucato—went to sleep. Sucato went to one of the bedrooms, Woods fell asleep in another bedroom, and Murray and Shippy remained in the living room with Liam. While in bed, between 6:00 a.m. and 7:00 a.m., Sucato received three calls from Abraham in which Abraham expressed a desire to rob Shippy of his drugs. During the second call, Sucato got up and passed the phone to Murray, to whom Abraham also expressed that he wanted to rob Shippy. Both Sucato and Murray told Abraham not to rob Shippy because there were children in the house. During these calls, Defendant—Abraham's brother and former sexual partner of Murray—was audible in the background.

Twenty minutes after the third call, a man in a large hoodie wielding a handgun entered the house at the living room where Murray, Shippy, and Liam were resting. The hooded gunman fired at least 18 shots at Shippy after Shippy fired one shot at the hooded gunman. Shippy was left permanently paralyzed from the wounds he sustained in the gunfire, and two of the hooded gunman's shots connected with Liam's head, killing the toddler almost instantly.

Murray, awakened by the shots, began screaming and fled to the room where Sucato was sleeping, waking Sucato. Sucato then went to the living room, where she

3

recognized Defendant as the hooded gunman. Sucato asked where Abraham was, and the hooded gunman replied that Abraham was not there.

After this exchange, Woods stopped in a hallway between the room she had been staying in and the living room to observe what was happening. Upon seeing her, the hooded gunman placed the barrel of his gun inches from her face and fired, killing her instantly.

Defendant's trial began on 17 February 2020. At trial, the State exercised two peremptory challenges to excuse African-American[2] female prospective jurors after another was removed for cause at the State's request. Defendant raised a *Batson* objection after the State's exercise of its peremptory challenges, alleging that the State had vetted African-American female jurors more aggressively than similarly situated white jurors. Without ruling on whether Defendant had made a prima facie case of discrimination through these allegations, the trial court asked the State for its input, at which point the State responded that it had exercised peremptory challenges against the two jurors for knowing a witness and not paying attention, respectively. The trial court then stated it did not "believe [there had] been a prima facie case for a *Batson* challenge."

At trial, the State presented a variety of evidence of the events that took place on 26 October 2016, including, in relevant part, testimony from responding officers,

---

[2] For consistency with the Record, we use the term "African-American" in this opinion, though we use it interchangeably with the term "black" referenced in our caselaw.

Murray, Shippy, and Sucato, as well as expert testimony from a forensic pathologist. The forensic pathologist testified that the shot that killed Woods was fired no more than six inches from her face, and likely no more than two to three inches, and one of the responding officers testified that a shell casing near the location where Woods died was found "in the threshold of the bedroom[.]" Of the evidence presented, only Sucato's testimony expressly identified Defendant as the hooded gunman.

Defendant moved to dismiss all charges against him for insufficiency of the evidence at the close of the State's evidence, at the close of all evidence, and after sentencing. The trial court denied each of these motions.

Defendant was found guilty on all charges on 5 March 2020 and appealed in open court. Between 13 December 2021 and 6 April 2023, we held this case in abeyance pending our Supreme Court's resolution of *State v. Campbell*, 384 N.C. 126 (2023).

## ANALYSIS

On appeal, Defendant argues that (A) the trial court erred in denying his motion to dismiss the charges and (B) the trial court's response to his *Batson* objection was procedurally inadequate.

### A. Motion to Dismiss

Defendant offers several bases for his argument that the trial court erred in denying his motion to dismiss for insufficient evidence,[3] all of which pertain to the alleged physical impossibility of the testimony of Aubrey Sucato, the only witness identifying Defendant as the hooded gunman. As a result of these deficiencies, Defendant contends, the denial of his motion to dismiss amounted to a denial of his right to due process. Reviewing the matter de novo, *see State v. Bagley*, 183 N.C. App. 514, 523 (2007), we disagree.

"In ruling on a motion to dismiss, the trial court need determine only whether there is substantial evidence of each essential element of the crime and that the defendant is the perpetrator." *State v. Call*, 349 N.C. 382, 417 (1998). As to his argument concerning impossibility, however, Defendant appears to misunderstand when the concept of evidentiary impossibility applies. Our Supreme Court has long held that "evidence which is inherently impossible or in conflict with indisputable physical facts or laws of nature is not sufficient to take the case to the jury." *State v. Cox*, 289 N.C. 414, 422-23 (1976) (quoting *Jones v. Schaffer*, 252 N.C. 368, 378 (1960)). However, it remains the case that "[t]he credibility of a witness's identification testimony is a matter for the jury's determination, and only in rare instances will

---

[3] All of Defendant's arguments relate to his being the perpetrator of the crimes alleged and not to whether sufficient evidence of the elements of the crimes themselves had been satisfied. *See State v. Winkler*, 368 N.C. 572, 574 (2015) (emphasis added) (remarking that, when ruling on a motion to dismiss, "the trial court need determine only whether there is substantial evidence of each essential element of the crime *and* that the defendant is the perpetrator").

credibility be a matter for the court's determination." *State v. Green*, 296 N.C. 183, 188 (1978) (citation omitted).

North Carolina appellate courts have reserved the application of the principle of evidentiary impossibility for cases where there is no "reasonable possibility" of the evidence being reconcilable with basic physical facts or laws of nature, *see State v. Miller*, 270 N.C. 726, 732 (1967), such that the evidence is "inherently incredible[.]" *State v. Coffey*, 326 N.C. 268, 283 (1990). However, all cases applying this standard have done so on an ad hoc basis without further clarification as to the specific principles animating the distinction between impossible evidence and evidentiary conflicts susceptible to resolution by a jury. *See Miller*, 270 N.C. at 732; *Cox*, 289 N.C. at 423; *State v. Wilson*, 293 N.C. 47, 52 (1977); *State v. Sneed*, 327 N.C. 266, 273 (1990). As such, we turn to the existing caselaw to determine more precisely when evidence is deemed inherently incredible.

Inherent incredibility, in the criminal context, has most often related to the positioning of a witness and the surrounding environment *vis-à-vis* the witness's physical ability to perceive the subject of the testimony at issue. *Compare Miller*, 270 N.C. at 732 (finding witness testimony to be impossible evidence where the witness purported to identify the defendant, a stranger, as the perpetrator at a distance of 286 feet before any crime had been committed), *with Cox*, 289 N.C. at 423 (holding "there [was] a reasonable possibility of observation sufficient to permit subsequent identification" where a witness observed the defendant at multiple points for

7

prolonged periods of time despite the defendant often wearing a mask throughout the duration), *and Coffey*, 326 N.C. at 283 ("[T]he defendant argues that the evidence at trial was insufficient to support his conviction because the testimony of all of the witnesses who purported to identify him as the man with the victim was inherently incredible. He contends this is so because of the extended period between the time when the witnesses observed him at the scene of the crime and their identification of him at trial and because the witnesses were very young and some of them viewed him at a distance. We do not agree."). In this way, the inquiry is typically closer to one of competency[4] than one of credibility *per se*, the latter of which remains solely for the jury. *See State v. Bowman*, 232 N.C. 374, 376 (1950) ("The defendant insists [the evidence] was incredible in character, and that the trial court ought to have nonsuited the action on the ground that the witnesses giving it were unworthy of belief. This argument misconceives the office of the statutory motion for a judgment of nonsuit in a criminal action. In ruling on such motion, the court does not pass upon the credibility of the witnesses for the prosecution, or take into account any evidence contradicting them offered by the defense."); *see also State v. Green*, 295 N.C. 244, 248-49 (1978) (rejecting a purported evidentiary impossibility argument where the basis for the argument related to the mental capacity and honesty of the witness).

---

[4] Despite this similarity, evidentiary impossibility remains an issue of sufficiency and not of admissibility. *See Sneed*, 327 N.C. at 272 ("*Miller* was not, strictly speaking, a case involving the admissibility of evidence. Instead, *Miller* concerned the question of whether the State's evidence was sufficient to withstand a motion to dismiss (at that time denominated a motion for nonsuit).").

And, while some criminal cases have involved questions of evidentiary impossibility that did not relate to a witness's ability to perceive the subject of testimony, our research, even including unpublished cases,[5] reveals no such case where such an argument has actually succeeded on appeal. *State v. Scriven*, COA12-1188, 226 N.C. App. 433, 2013 WL 1314774, *2 (unpublished) (rejecting an evidentiary impossibility argument where the victim's testimony allegedly conflicted with physical evidence presented by the State); *State v. Green*, COA02-1357, 160 N.C. App. 415, 2003 WL 22145857, *3-4 (unpublished) (rejecting an evidentiary impossibility argument where the defendant contended the evidence suggested a police officer moved out of the way of Defendant's vehicle and fired two shots with superhuman speed); *see also State v. Windsor*, COA09-713, 206 N.C. App. 332, 2010 WL 3001945, *4 (unpublished) ("However unlikely it may seem that an adult woman could be asphyxiated by an adult man's taping a plastic bag over her head, we do not view it as a physical impossibility."), *disc. rev. denied*, 364 N.C. 607 (2010).

---

[5] While we remain observant of the rule that "unpublished opinion[s] establish[] no precedent and [are] not binding authority," *Long v. Harris*, 137 N.C. App. 461, 470 (2000), we nonetheless find the above-cited cases useful as illustrations, in part, of the general patterns of reasoning employed to distinguish between impossible evidence and evidentiary conflicts susceptible to resolution by a jury. In light of the scarcity of caselaw on the topic of evidentiary impossibility generally, we mention these cases for this illustrative purpose and not for the purpose of attempting to alter or expand their precedential weight.

Bearing this background in mind, we find it clear that, at least in a criminal context,[6] evidence is only inherently incredible where the alleged impossibility *fundamentally* undermines the reliability of the evidence as opposed to creating conflicts at the margins.[7] For this reason, and in keeping with the language of the *Cox* standard itself, a defendant must establish that the comparison point against which he argues evidence is inherently incredible does, in fact, amount to a "physical

---

[6] We note that the precursors to the notion of evidentiary impossibility in our jurisdiction were civil suits where contributory negligence was at issue, many of which applied the concept to discrepancies between details. *See, e.g., Atkins v. White Transp. Co.*, 224 N.C. 688, 691 (1944) (reasoning from the rate of speed at which the plaintiff was driving and his proximity to a nearby bus that it was impossible for him to avoid a collision); *Jones*, 252 N.C. at 377-78 (1960) (performing similar calculations to determine which party, if any, was negligent in a multi-vehicle wreck at an intersection); *Powers v. S. Sternberg & Co.*, 213 N.C. 41, 41 (1938) (determining that a driver was contributorily negligent based on the force with which he rammed into another vehicle and the scale of the ensuing destruction). However, we further note that this type of analysis has never been employed in a criminal matter since evidentiary impossibility was first applied in a criminal context in *State v Miller*. *See generally Miller*, 270 N.C. 726. This is perhaps attributable to the inherent tension between these types of arguments and the long-held principle that "[c]ontradictions and discrepancies in the [evidence in criminal cases] are to be resolved by the jury," *State v. Simpson*, 244 N.C. 325, 331 (1956), as well as the understanding in our caselaw that summary judgment on the issue of contributory negligence, by contrast, necessarily requires a judicial determination of an issue ordinarily reserved for the finder of fact. *Cone v. Watson*, 224 N.C. App. 241, 245 (2012) ("The existence of contributory negligence is ordinarily a question for the jury[.]"). In light of this divide between doctrinal norms, these civil cases predating our established evidentiary impossibility jurisprudence, while helpful to contextualize the doctrine, do not directly inform our analysis of its application in criminal cases.

[7] This is, in part, why a significant subset of criminal cases in which evidentiary impossibility is at issue reference the doctrine as pertaining exclusively to witness identification of the defendant. *See, e.g., State v. Turner*, 305 N.C. 356, 363 (1982) (marks omitted) ("According to *Miller*, the test to be employed to determine whether the identification evidence is inherently incredible is whether there is a reasonable possibility of observation sufficient to permit subsequent identification. Where such a possibility exists, the credibility of the witness' identification and the weight given his testimony is for the jury to decide."); *State v. Hoff*, 224 N.C. App. 155, 161 (2012) (citing *Miller* as applicable only to witness identification of a defendant), *disc. rev. denied*, 367 N.C. 211 (2013); *State v. Jackson*, 215 N.C. App. 339, 346-47 (2011) (same). While we do not hold that evidentiary impossibility in criminal cases can *only* apply in cases where a witness's ability to perceive the subject of testimony is physically impossible, we observe from the existing caselaw that only the rarest of criminal cases would see it apply outside that context.

fact[] or law[] of nature . . . ."[8]  *Cox*, 289 N.C. at 422-23.  A conclusory allegation of physical impossibility, even together with some conflict in the evidence, is not sufficient to reverse a trial court's denial of a defendant's motion to dismiss on appeal absent a showing of what physical fact or law of nature was established and how that rendered the evidence at issue impossible.  *E.g. Bowman*, 232 N.C. at 376 (rejecting a defendant's evidentiary impossibility argument where the alleged conflict was a matter of credibility, not physical impossibility); *Green*, 295 N.C. at 248-49 (rejecting a purported evidentiary impossibility argument where the basis for the argument was the mental capacity and honesty of the witness rather than a conflict with physical facts or laws of nature); *supra* at footnote 7 and accompanying citations.  To

---

[8] The only case seemingly contesting this notion is *State v. Gamble*, in which we remarked that "[t]he witness's credibility is a matter for the court when the only testimony justifying submission of the case to the jury is inherently incredible and in conflict with the State's own evidence[,]" omitting mention of physical impossibility entirely.  *State v. Gamble*, 243 N.C. App. 414, 423 (2015) (marks omitted).  However, for two reasons, the language in *Gamble* does not alter our reading of the governing standards with respect to evidentiary impossibility.

First, the language in *Gamble*, despite appearing to deviate from the governing standard set out in *Cox* and *Miller*, was actually a truncated quotation to *Wilson*, the full relevant language of which reads as follows:  "While ordinarily the credibility of witnesses and the weight to be given their testimony is exclusively a matter for the jury, this rule does not apply when the only testimony justifying submission of the case to the jury is inherently incredible and in conflict with *the physical conditions established by* the State's own evidence."  *Wilson*, 293 N.C. at 51 (emphasis added).  The standard established by our Supreme Court has therefore remained unchanged.

Second, and more importantly, *Gamble* did not actually purport to change the applicable standard in evidentiary impossibility cases.  Despite the omission of critical language in *Wilson*, the use of the truncated quote in *Gamble* was immediately followed by a reiteration of the principle that evidentiary conflicts are to be resolved by the finder of fact and a rejection of the defendant's evidentiary impossibility argument.  *See Gamble*, 243 N.C. App. at 423 ("No such conflict exists here.  Any issue concerning Detective Russell's credibility, or the weight to be given to his testimony, was a matter for the jury.  The trial court therefore did not err, much less commit plain error, in admitting this testimony.").  Accordingly, there is no actual conflict between *Gamble* and the foundational principle that evidentiary impossibility arguments must be grounded in "physical facts or laws of nature . . . ."  *Cox*, 289 N.C. at 422.

hold otherwise would undermine the bedrock principle that "[c]ontradictions and discrepancies, even in the State's evidence, are for the jury to resolve . . . ." *Cox*, 289 N.C. at 423 (citing *State v. Mabry*, 269 N.C. 293, 296 (1967)); *see also Wilson*, 293 N.C. at 51 ("[O]rdinarily the credibility of witnesses and the weight to be given their testimony is exclusively a matter for the jury[.]").

Turning to the case at hand, we think only some of Defendant's arguments, if true, would render Sucato's testimony inherently incredible. Defendant makes three specific arguments: first, Sucato's testimony conflicts with other witness testimony; second, Sucato's testimony is internally inconsistent; and, third, Sucato's testimony that the hooded gunman shot Miranda Woods while standing in the living room places her at a vantage point that conflicts with the State's other evidence. Of these, only the last, if true, would amount to evidentiary impossibility.

The first alleged conflict—conflict between Sucato's testimony and that of other witnesses—does not, even if true, render Sucato's testimony impossible. The specific conflict alleged by Defendant in connection with this argument is that neither Murray nor Shippy saw Sucato despite the fact that, if all of their testimony were to be believed, they would have necessarily crossed paths. However, conflict between witness testimony does not necessarily amount to "conflict with indisputable physical facts or laws of nature[,]" and this specific conflict in testimony amounts only to a discrepancy between individuals' recollection and perspectives. *Cox*, 289 N.C. at 422. Defendant points us to no physical fact or law of nature that Murray or Shippy's

testimony established that Sucato's testimony, in turn, violated. Defendant has therefore not established that Sucato's testimony was inherently incredible on this basis, and any associated contradictions and discrepancies in the evidence were for the jury to resolve. *Id.* at 423.

The second alleged conflict—internal inconsistency in Sucato's testimony— also does not, if true, render Sucato's testimony impossible. With respect to this issue, the specific conflict alleged is that Sucato claims to have been able to identify Defendant as the hooded gunman despite having not looked at his face or being able to identify key details about Defendant's appearance from memory. However, this argument is also not predicated on impossibility; rather, it relates to the witness's credibility in light of her inability to recall previously observed details of Defendant's appearance. As Defendant has not argued that this testimony is actually in conflict with a physical fact or law of nature, Defendant cannot establish on this basis that the evidence was inherently incredible and, by extension, impossible.[9]

---

[9] We note that this argument, unlike the other arguments in this section of Defendant's brief, does not explicitly reference evidentiary impossibility as the basis for the allegation that the trial court erred. To the extent Defendant intended this argument as a freestanding argument that his identification was unsupported by substantial evidence, we still disagree. *State v. Stallings*, which Defendant primarily relies upon for the argument that Sucato's testimony was too internally inconsistent to qualify as substantial evidence, concerned the testimony of a witness who identified a suspect as the defendant using only general characteristics:

> [The witness] testified that defendant was a regular customer. She never positively identified [the] defendant as the robber, however. She testified that [the] defendant's eyes were blue, but failed to identify them as the same distinctive eyes. Ms. King did not match [the]

This brings us back to the third alleged conflict—discrepancy between the vantage point at which Sucato claims to have been standing when she observed Defendant and the location where the State's other evidence would have placed Defendant. This argument is divided into two further sub-arguments that Sucato's testimony "places [Defendant] at a distance from [] Woods which is incompatible with [Woods's] autopsy" and that Sucato's testimony "places [Defendant] in the living room when he fired the gun, while the shell casing was located in the back bedroom requiring the shooter to have been standing next to the bedroom at the end of the hallway[.]" Unlike the other alleged conflicts, Defendant relies on the structure of the house, pathologist testimony, photographic evidence, and ballistics evidence to support the proposition that Sucato was in a location where her observing Defendant

_____

defendant's voice with the robber's. She stated that the robber had an unusual walk, and that [the] defendant had a "similar walk."

. . . .

[The witness's testimony] alone did not suffice to carry the issue of defendant's identity to the jury. Although she testified that she clearly remembered the robber's voice, walk and eyes, she never positively identified defendant by these characteristics despite extensive examination and opportunity. Taking her evidence in the light most favorable to the State, the most that can be inferred is that defendant and the robber walked similarly and had blue eyes. Such limited and equivocal evidence, standing alone, will not withstand a timely motion to dismiss.

*State v. Stallings*, 77 N.C. App. 189, 190 (1985), *disc. rev. denied*, 315 N.C. 596 (1986). Here, *Stallings* is inapposite because, while Sucato testified she only recognized the shooter as Defendant by his voice, build, and walk, this testimony was further contextualized by a prior phone conversation about robbing Shippy in which Defendant was audible and a verbal exchange between the hooded gunman and Sucato that implied a familiarity with Abraham, Defendant's brother. Even as a standalone argument, then, the trial court did not err on this basis.

14

would have been physically impossible. As these arguments are based on "physical facts[,]" *Cox*, 289 N.C. at 422, they may, if true, support a conclusion that Sucato's testimony constituted impossible evidence.

Notwithstanding the requisite foundation of physical impossibility, this argument does not withstand scrutiny. With respect to the shooting of Woods, Defendant contends that Sucato could not have been standing between the hooded gunman and the front door—a location where she testified she was standing at the time she spoke to him—when Woods was shot. He argues this is the case because the physical evidence, supported by pathologist testimony, placed the hooded gunman no more than a few feet, if not inches, from the victim when the shot was fired, rendering Sucato's testimony inherently incredible by virtue of the positioning discrepancy. However, Defendant's interpretation of the testimony only creates a discrepancy under the assumption that the hooded gunman remained in a fixed location in the living room between the time he spoke to Sucato and the time he shot Woods. Sucato's testimony contains no such statement, and Defendant points us to no portion of Sucato's testimony inconsistent with Defendant having moved toward Woods before he shot her.

Similarly, with respect to the ballistics evidence, Defendant points to photographic evidence and expert testimony indicating the shell casing from the bullet that killed Woods was found in a bedroom in the hallway, a location where it could not have landed if Defendant had been in the living room when he shot Woods.

15

As with Defendant's previous argument, though, nothing in Sucato's testimony indicates Defendant did not move before shooting Woods. Moreover, despite Defendant characterizing the shell casing as having been "a few feet inside the bedroom[,]" the uncontradicted evidence was that the shell casing was found "in the threshold of the bedroom," a location consistent with Sucato's ability to observe Woods and the hooded gunman.

Consequently, the trial court did not err in denying Defendant's motion to dismiss on this basis.

## B. *Batson* Objection

Defendant also argues the trial court made inadequate *Batson* findings in light of *State v. Hobbs*. 374 N.C. 345 (2020). Under *Batson v. Kentucky*,

> a defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial. To establish such a case, the defendant first must show that he is a member of a cognizable racial group and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits those to discriminate who are of a mind to discriminate. Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.
>
> . . . .

16

> Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging [jurors of the excluded class].

*Batson v. Kentucky*, 476 U.S. 79, 96, 97 (1986) (marks and citations omitted); *see also Powers v. Ohio*, 499 U.S. 400, 409-410 (1991) (applying the principles of *Batson* even where the stricken juror's race did not match the defendant's), *cert. denied*, 558 U.S. 851 (2009). Put differently, a *Batson* analysis consists of a three-step process: "First, the defendant must make a prima facie showing that the [S]tate exercised a race-based peremptory challenge." *State v. Taylor*, 362 N.C. 514, 527 (2008). Second, "[i]f the defendant makes the requisite showing, the burden shifts to the [S]tate to offer a facially valid, race-neutral explanation for the peremptory challenge." *Id.* "Finally, the trial court must decide whether the defendant has proved purposeful discrimination." *Id.*

In *State v. Hobbs*, our Supreme Court held that a trial court is required to consider on the record factors weighing for and against findings of discrimination in order to sufficiently respond to a *Batson* challenge where the trial court moved to *Batson's* second step without ruling on the defendant's prima facie case. *Hobbs*, 374 N.C. at 360 ("On remand, considering the evidence in its totality, the trial court must consider whether the primary reason given by the State for challenging [the stricken juror] was pretextual. This determination must be made in light of all the circumstances, including how [the stricken juror's] responses during voir dire compare to any similarly situated white juror, the history of the use of peremptory

challenges in jury selection in that county, and the fact that, at the time that the State challenged [the stricken juror], the State had used eight of its eleven peremptory challenges against black potential jurors."). Moreover, it reiterated the principle that, "[w]here the State has provided reasons for its peremptory challenges, thus moving to *Batson*'s second step, and the trial court has ruled on them, completing *Batson*'s third step, the question of whether a defendant initially established a prima facie case of discrimination becomes moot." *Id.* at 354 (citing *State v. Robinson*, 330 N.C. 1, 17 (1991)). Thus, the overall effect of *Hobbs* was to clarify the procedural requirements for a trial court responding to a *Batson* objection not only in cases where the trial court actually finds a prima facie case has been shown, but also in cases where the trial court proceeds to the second and third steps of *Batson*, thereby mooting the first step.

These principles were further elaborated upon in *State v. Campbell*, 384 N.C. 126 (2023), in which our Supreme Court further clarified under what circumstances a trial court's analysis of the first step of *Batson* becomes moot. In that case, the trial court sought, purportedly during the first step of *Batson*, race-neutral reasons from the State for its peremptory challenges to two African-American jurors. *Id.* at 127. The trial court denied the defendant's *Batson* challenge on the basis that there had been no prima facie showing. *Id.* However, despite the trial court having already ruled on the *Batson* objection and the State cautioning the trial court that offering race-neutral reasons at that stage in the proceedings "could be viewed as a stipulation

that there was a prima facie showing," the trial court "ordered the State to proceed as to stating a racially-neutral basis for the exercise of the peremptory challenges." *Id.* at 128. After hearing the State's race-neutral reasons, the trial court stated that it "continue[d] to find[] . . . that there ha[d] not been a prima facie showing as to purposeful discrimination." *Id.* at 130.

Ultimately, our Supreme Court reasoned that, because the trial court had already announced its ruling as to the first step of *Batson*, its own analysis on appeal was limited to whether the trial court had clearly erred in determining the defendant failed to establish a prima facie case. *Id.* at 136; *see also State v. Augustine*, 359 N.C. 709, 715 (2005) (marks and citations omitted) ("The trial court's [*Batson*] ruling is accorded deference on review and will not be disturbed unless it is clearly erroneous."), *cert. denied*, 548 U.S. 925 (2006). However, it further remarked that "[t]he State appropriately objected to the trial court's attempt to move beyond step one[,]" clarifying that the reservation of its analysis to the first step of *Batson* was based on the fact that "the trial court clearly ruled there had been no prima facie showing *before* the State articulated its reasons[.]" *Id.* (marks omitted) (emphasis added) (quoting *State v. Hoffman*, 348 N.C. 548, 552 (1998)).

Here, the full exchange between the trial court, the State, and Defendant following Defendant's *Batson* objection reads as follows:

THE COURT: All right. So what is the objection?

[DEFENDANT'S COUNSEL]: Your Honor, this is a *Batson*. So far, what I've seen is the State, I believe, has used two peremptory challenges and both were African-Americans that she struck, especially the first juror, [Juror No. 9].

THE COURT: Right, who knew one of the relatives of the defendant. They went to high school.

[DEFENDANT'S COUNSEL]: Yes, they did, but the State passed on others who knew some members. And Juror No. 4, although it was for cause, she was also an African-American female. Now, she has struck [Juror No. 9] who is an African-American female. [Juror No. 10], other than—she did not know any of the family members. And all I heard was that she had issues with the child care, which [Juror No. 11] also had issues with child care, and she passed on her.

THE COURT: Okay. Does the State want to be heard?

[THE STATE]: Your Honor, I am not sure that the Court can consider Juror No. 4 because it was for cause and there was no objection. I really liked [Juror No. 9], but, of course, I'm concerned that she points out someone who's sitting on the front row. She points out [Defendant's family member] as someone that she knows. I'm not going to keep anybody that knows—unless I absolutely have to—that knows a member of the defendant's family. There's too strong of a feeling there.

In my past experience, even if it is tangential—we went to the high school; tie to the family—I do not keep that. In all honesty, I probably would have stricken Juror No. 4 because her daughter dated [Defendant's family member's] son and she knew two of [Defendant's] relatives. Just to be honest with the Court, that would have been the reason there.

The reason that I attempted to strike [Juror No. 10] is when she came up and sat down, she immediately began to

yawn. She's yawned several times throughout the brief period of time I talked to her. That concerns me. I have had jurors fall asleep and not listen to the evidence before.

And when I asked her about paying the fine, she said "I have the baby and I don't have time to come up here and mess with anything like an open container." So I do have real concerns about her commitment to paying attention, to being awake and alert, and to how serious this proceeding is. Those are my reasons for striking her.

THE COURT: Yes, sir, anything else?

[DEFENDANT'S COUNSEL]: I understand knowing someone in the family. However, knowing the family of— [Defendant's family member], his family is well known in the community. And you will strike a lot of African-Americans just because the family is African-American, which although it may not be systematic in its nature although it does sound race neutral. But and [sic] another thing I would like to point out is there are several people on the jury that has said they know [the prosecutor] and she passed on them.

THE COURT: All right. I don't believe there's been a prima facie case for a *Batson* challenge. The Court is going to deny that challenge[.] [A]nything else we need to address[?]

[THE STATE]: Not from the State.

THE COURT: For the record, the juror in question is a black female. Juror No. 6 was left on the jury and he is a black African-American male. The State has not targeted race as a component of its questioning. The Court did note the demeanor of Juror No. 10 during questioning and certainly was concerned about her.

Unlike in *Campbell*, the trial court in this case immediately sought the State's input upon hearing Defendant's argument under *Batson*'s first step, issuing no

21

preliminary ruling on whether Defendant had made a prima facie case. And, although the trial court's ruling nominally concerned whether Defendant had established a prima facie case, the fact that it issued the ruling after hearing the State's race-neutral reasons made the ruling, in substance, a ruling on the third step of *Batson*. *Hobbs*, 374 N.C. at 355 ("The facts of this case are governed by the rule as stated by this Court in *Robinson* because the trial court here did consider the prosecution's race-neutral reasons for excusing jurors [], ultimately concluding that there was no racial discrimination.") Thus, under the clear command of *Hobbs*, "[w]here the State has provided reasons for its peremptory challenges, thus moving to *Batson*'s second step, and the trial court has ruled on them, completing *Batson*'s third step, the question of whether a defendant initially established a prima facie case of discrimination becomes moot." *Id.* at 354 (citing *Robinson*, 330 N.C. at 17).

As the trial court issued its ruling after soliciting input from the State, it was required, pursuant to *Hobbs*, to engage in a full analysis of Defendant's arguments that the State employed its peremptory strikes in a racially discriminatory manner. *Id.* at 355, 356 (marks and citations omitted) ("[W]hether a defendant has established a prima facie case of discrimination in a Batson challenge becomes moot after the State has provided purportedly race-neutral reasons for its peremptory challenges and those reasons are considered by the trial court. . . . A defendant may rely on all relevant circumstances to support a claim of racial discrimination in jury selection. It follows, then, that when a defendant presents evidence raising an inference of

discrimination, a trial court, and a reviewing appellate court, must consider that evidence in determining whether the defendant has proved purposeful discrimination in the State's use of a peremptory challenge.").  Evidence on which a defendant may rely in arguing the State discriminated on the basis of race includes, but is not limited to, the following:

> • statistical evidence about the prosecutor's use of peremptory strikes against black prospective jurors as compared to white prospective jurors in the case;
>
> • evidence of a prosecutor's disparate questioning and investigation of black and white prospective jurors in the case;
>
> • side-by-side comparisons of black prospective jurors who were struck and white prospective jurors who were not struck in the case;
>
> • a prosecutor's misrepresentations of the record when defending the strikes during the *Batson* hearing;
>
> • relevant history of the State's peremptory strikes in past cases; or
>
> • other relevant circumstances that bear upon the issue of racial discrimination.

*Id.*

Here, Defendant has only argued at trial, and only argues on appeal, that the State's use of peremptory challenges was discriminatory for the following reasons: (1) both of the State's peremptory challenges at that point had been used on African-American prospective jurors; (2) the State used a peremptory strike to excuse Juror

No. 9 for knowing Defendant's relative, but did not use strikes on similarly situated white jurors who knew individuals connected with the case; (3) the State moved to strike for cause Juror No. 4, another African-American prospective juror, for childcare-related reasons but did not make a similar motion with respect to Juror No. 11, a white juror who also had childcare-related concerns; and (4) the State did not move to strike for cause, or exercise a peremptory challenge against, any juror who knew the prosecutor.[10]

At trial, the entirety of the trial court's analysis of these arguments was as follows:

> For the record, the juror in question is a black female. Juror No. 6 was left on the jury and he is a black African-American male. The State has not targeted race as a component of its questioning. The Court did note the demeanor of Juror No. 10 during questioning and certainly was concerned about her.

Under *Hobbs*, these findings are inadequate. "[T]he trial court did not explain how it weighed the totality of the circumstances surrounding the prosecution's use of

---

[10] At trial, Defendant also remarked of the family member known to Juror No. 9 that "his family is well known in the community. And you will strike a lot of African-Americans just because the family is African-American, which although it may not be systematic in its nature although it does sound race neutral." We note that the wording of this argument makes his point somewhat unclear; and, although Defendant also mentions this argument on appeal, he does not elaborate beyond what was said at trial.

To the extent Defendant argues for the expansion of *Batson* to cases where the State exercises strikes in a manner that incidentally, rather than purposefully, results in disproportionate exercises of peremptory strikes by race, the requisite showing in *Batson* cases remains "purposeful discrimination." *Campbell*, 384 N.C. at 135 (2023). Thus, this argument will not factor further into our analysis, as it is predicated on the incorrect legal standard.

peremptory challenges," nor did it conduct a comparative analysis between the stricken African-American jurors and the other jurors alleged to have been similarly situated. *Hobbs*, 374 N.C. at 358. Indeed, many of Defendant's arguments went completely unaddressed.

Ordinarily, where a Defendant appeals a trial court's ruling on a *Batson* objection, we conduct a comparable analysis to that of the trial court in order to determine whether the ruling at issue was clearly erroneous. *Id.* at 356 ("[W]hen a defendant presents evidence raising an inference of discrimination, a trial court, and a reviewing appellate court, must consider that evidence in determining whether the defendant has proved purposeful discrimination in the State's use of a peremptory challenge."); *see also Augustine*, 359 N.C. at 715 (marks and citations omitted) ("The trial court's [*Batson*] ruling is accorded deference on review and will not be disturbed unless it is clearly erroneous."). However, here, Defendant has not sought our review of the trial court's substantive ruling; rather, he argues only that "the trial court [] failed to conduct a comparative juror analysis as required by *Hobbs*" and that "this case must be remanded to the trial court for further proceedings[.]" Accordingly, we reverse and remand to the trial court for further proceedings consistent with those set out in *Hobbs*. *Hobbs*, 374 N.C. at 360 ("The trial court is instructed to conduct a *Batson* hearing consistent with this opinion, to make findings of fact and conclusions of law, and to certify its order to this Court within sixty days of the filing date of this opinion[.]").

## CONCLUSION

We are unpersuaded by Defendant's argument that the trial court erred in failing to dismiss the charges against him. However, we reverse and remand for a new *Batson* hearing in light of the trial court's procession to *Batson*'s third step and subsequent failure to conduct an analysis satisfactory under the procedural requirements established in *State v. Hobbs.*

In the event that the trial court conducts an adequate *Batson* hearing and determines no purposeful discrimination occurred, Defendant's conviction will remain undisturbed as no error will have occurred at trial. However, in the event the trial court rules in Defendant's favor on his *Batson* challenge, Defendant shall receive a new trial. *State v. Alexander*, 274 N.C. App. 31, 47 (2020). Pursuant to Rule 32(b) of our Rules of Appellate Procedure, we direct that the mandate of this Court will issue to the trial court in five business days following the filing of this Opinion. N.C. R. App. P. 32(b) (2023).

NO ERROR IN PART; REVERSED AND REMANDED IN PART.

Judge DILLON concurs.

Judge STADING concurs in part and dissents in part.

No. COA21-34 – State v. Wilson

DILLON, Judge, concurring.

I concur in the majority. I write separately regarding Defendant's *Batson* challenge. The trial court stated that it had determined that there had not been a *prima facie* showing of discrimination during jury selection, thereby implying that it had not moved beyond step one of the *Batson* analysis. And, based on the Record before us, I would hold that the trial court would not be in error for so determining.

Certainly, the State may be heard during step one. For instance, assume a defendant points to the fact that the State excused a number of black jurors to make out its *prima facie* case during step one. In such a case, the State could point out that it had also objected to several white potential jurors and had not otherwise objected to other black jurors without ever moving to step two. But, even if the State on its own mentions "step-two" evidence, showing race-neutral reasons why it excused certain black jurors, the trial court could ignore this step-two evidence and make a ruling on whether a *prima facie* showing had been made.

But, here, it appears the trial court did consider at least some of the State's step-two evidence. For instance, the trial court mentioned how one juror was inattentive as a race-neutral reason for this juror being excused. Therefore, it appears from the Record that the trial court moved beyond step one. Based on our current jurisprudence, we must hold that the trial court must conduct a full *Batson* inquiry.

STADING, Judge, concurring in part and dissenting in part.

I concur with the majority's decision that the trial court did not err in denying defendant's motion to dismiss. However, I respectfully dissent from the majority's holding that the trial court failed to meet necessary procedural requirements imposed by *State v. Hobbs*, 374 N.C. 345, 841 S.E.2d 492 (2020).

Defendant argues, and the majority agrees, that the question of whether defendant established a prima facie case of discrimination became moot when the State volunteered its reasoning for challenging the prospective jurors. The majority opinion turns on *Hobbs*, in which the trial court first determined that the defendant "had not made out a prima facie case of discrimination." *Id.* at 348, 841 S.E.2d at 496. "However, [then] the trial court asked the State, for purposes of the record, to explain the State's use of peremptory challenges. . . ." *Id.* On appeal, the North Carolina Supreme Court held that "[w]here the State has provided reasons for its peremptory challenges, thus moving to *Batson*'s second step, *and the trial court has ruled on them*, completing *Batson*'s third step, the question of whether a defendant initially established a prima facie case of discrimination becomes moot." *Id.* at 345, 354, 841 S.E.2d at 499 (citation omitted) (emphasis added). In holding the inquiry of a prima facie showing of discrimination moot, the *Hobbs* opinion cited *Hernandez v. New York*: "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges *and the trial court has ruled on the ultimate question of intentional discrimination*, the preliminary issue of whether the defendant had made

a prima facie showing becomes moot." *Id.* at 354, 841 S.E.2d at 500 (citing *Hernandez v. New York*, 500 U.S. 352, 359, 111 S. Ct. 1859, 1866 (1991) (emphasis added)).

The majority also maintains that an application of *State v. Campbell* to this case supports the proposition that the first step of the trial court's *Batson* analysis was moot. 384 N.C. 126, 884 S.E.2d 674 (2023). In that case, the defendant argued to the North Carolina Supreme Court that our Court erred in affirming the trial court's determination that he failed to make a prima facie showing of discrimination under *Batson*. *Id.* at 135, 884 S.E.2d at 682. At trial, the prosecutor in *Campbell* was careful to remind the trial court to rule on the first step of the *Batson* analysis before offering an argument in furtherance of the second step. *Id.* at 128, 884 S.E.2d at 677. The trial court then ruled that the defendant failed to establish a prima face case. *Id.* at 128, 884 S.E.2d at 678. Nonetheless, the trial court ordered "the State to proceed as to stating a racially-neutral basis for the exercise of the peremptory challenges." *Id.* Ultimately, the Court held that "[t]he State appropriately objected to the trial court's attempt to move beyond step one" and precluded a consideration of the step two response at a step one analysis. *Id.* at 136, 884 S.E.2d at 682. However, the Court did not speak to whether the State's response to step two would have precluded the trial court judge from issuing a ruling on step one of the *Batson* analysis.

In the matter presently before us, after concluding the State's response compelled the trial court to proceed to the third *Batson* step, the majority deemed the trial court's findings inadequate to conduct a comparative-juror analysis. While the

record may lack substance to survive the third *Batson* step, such an inquiry presumes that step one is moot. However, in the instant case, a determination of the first *Batson* step is not moot. Thus, engagement in a step three analysis is premature since the trial court determined that defendant did not meet his burden at step one. *State v. Hoffman*, 348 N.C. 548, 554, 500 S.E.2d 718, 722–23 (1998) ("We do not proceed to step two of the *Batson* analysis when the trial court has not done so.").

The record shows that it was not the trial court, but the State, that proceeded to step two of the *Batson* inquiry. *See id.* Once defendant raised the *Batson* challenge and stated his grounds, the trial court invited the State to respond. The State prematurely sought to address the second prong of the *Batson* inquiry—an act which was beyond the control of the trial court. Existing case law does not impute the actions of the parties or their counsel to the trial court in conducting a legal analysis under *Batson.* Unless the trial court itself improperly proceeds beyond the initial inquiry in its analysis—as was done in *Hobbs*—precedent does not dictate that the trial court forfeits the ability to redirect the proceedings back to an earlier analytical step. *Batson* provides trial courts broad latitude in assessing discriminatory inferences as such judges "experienced in supervising voir dire, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination. . . ." *Batson v. Kentucky*, 476 U.S. 79, 97, 106 S. Ct. 1712, 1723 (1986). A holding to the contrary takes the power of prescribing when the first step of a *Batson* inquiry ends out of the hands of the trial court judge and

into the power of a party—the State in this case—effectively allowing it to control the direction of the proceedings.

Our precedent establishes that a trial judge may invite the State to comment before issuing a ruling on the preliminary step of a *Batson* analysis—which is what the trial judge did here. *See State v. Smith*, 351 N.C. 251, 262, 524 S.E.2d 28, 37 (2000) ("[T]he trial court concluded that defendant had not made a prima facie showing that the peremptory challenge was exercised on the basis of race, but the trial court permitted the State to make any comments for the record that it chose to make."). Unlike *Hobbs*, in this case, the trial court judge did not ask the State for the reasons underlying its peremptory challenges because the judge had not yet made a ruling on them. *See Hobbs*, 374 N.C. at 348, 841 S.E.2d at 496; *Smith*, 351 N.C. at 262, 524 S.E.2d at 37 ("[O]ur review is limited to whether the trial court erred in finding that defendant failed to make a *prima facie* showing, even if the State offers reasons for its exercise of the peremptory challenges."). Once the State provided comment, the trial court permitted defendant to respond. *Cf. Hoffman*, 348 N.C. at 554, 500 S.E.2d at 723 (noting that, as to a *Batson* first-step inquiry, "although the State was given an opportunity to articulate its reasons for its peremptory challenges, defendant was not given an opportunity to respond. Defendant must be accorded this opportunity. . . ."). Defendant then remarked that his family was "well known in the community" and mentioned the prosecutor's passing on potential jurors who knew the prosecutor. Following defendant's response, the trial court directed the

proceedings back to step one and ruled "I don't believe there's been a prima facie case for a *Batson* challenge. The Court is going to deny that challenge. . . ."

After hearing the State's comments and defendant's response, the trial court concluded that defendant failed to meet the prima facie case necessary for a *Batson* challenge. Moreover, a review of the record shows that the trial court already made this determination on step one of the analysis prior to offering any commentary on juror demeanor. Discerning no error, I find that the trial court's *Batson* ruling falls within the parameters of the great deference afforded to trial judges. *See, e.g., State v. Floyd*, 343 N.C. 101, 104, 468 S.E.2d 46, 48, *cert. denied*, 519 U.S. 896, 117 S. Ct. 241, 136 L.Ed.2d 170 (1996) ("[T]he trial court's ruling . . . must be accorded great deference by a reviewing court."); *Hoffman*, 348 N.C. at 554, 500 S.E.2d at 722–23. Accordingly, I concur with the majority's decision that the trial court did not err in denying the defendant's motion to dismiss. But I respectfully dissent from the majority's holding that the trial court's step one *Batson* determination was moot.